McRAE v. TOASTMASTER, INC.

[158 N.C. App. 70 (2003)]

═══════════

ALBERTA McRAE, Employee, Plaintiff v. TOASTMASTER, INC., Employer, SELF-INSURED (CORPORATE CLAIMS MANAGEMENT, Servicing Agent), Defendant

No. COA02-1072

(Filed 20 May 2003)

**1. Workers' Compensation— return to work—no more presumption of disability—failure to perform as required**

The Industrial Commission did not err in a workers' compensation action by concluding that plaintiff constructively refused suitable employment when she did not perform as required after returning from carpel tunnel surgery. The employer provided competent evidence that plaintiff's failure to perform the task she was given was not related to her prior compensable injury, the

McRAE v. TOASTMASTER, INC.

[158 N.C. App. 70 (2003)]

burden shifted to plaintiff, and she did not present evidence of disability as a result of her injury. All presumption of disability ended when plaintiff returned to work.

**2. Workers' Compensation— average weekly wage—Form 21**

The Industrial Commission did not err in a workers' compensation action in finding plaintiff's average weekly wage to be as listed on a Form 21. The documents cited by the employer as being contrary to that amount did not render the Form 21 incompetent.

Judge WYNN dissenting.

Appeal by plaintiff and defendant from Opinion and Award of the North Carolina Industrial Commission filed 18 April 2002. Heard in the Court of Appeals 22 April 2003.

*H. Bright Lindler for plaintiff.*

*Cranfill, Sumner & Hartzog, L.L.P., by Kirk D. Kuhns and Jaye E. Bingham, for defendant.*

TYSON, Judge.

Alberta McRae ("plaintiff") appealed from the opinion and award of the North Carolina Industrial Commission ("Commission") ordering Toastmaster, Inc. ("employer") through its servicing agent Corporate Claims Management to pay plaintiff $166.67 per week for 16 weeks, medical expenses, and plaintiff's attorney fees, expert fee and costs. Employer cross-appeals. We affirm.

I. Background

In October 1996, plaintiff commenced work for employer as an assembler. During her first six months on the job, she peeled Uniform Product Code labels off of a roll and placed them onto boxes traveling on a conveyor. Employer transferred plaintiff to "dialing." Dialing required plaintiff to insert the movement into the back of a clock, turn the clock over, and install the hour and minute hands on the front of the clock. The production rate for "dialing" was one hundred twenty-five clocks per hour.

In 1997, plaintiff experienced pain and numbness in her right hand. In January 1998, plaintiff visited the plant nurse, who referred her to Occupational Health at Scotland Memorial Hospital. Plaintiff

was treated and restricted to light-duty work until February 17. Plaintiff's symptoms persisted and she obtained permission to see Dr. Brenner, an orthopaedic surgeon.

In June of 1998, plaintiff was referred to Dr. Brenner for the pain in her right hand. Plaintiff was diagnosed with carpal tunnel syndrome and was injected with medication. Plaintiff was restricted to light work, and her employer provided plaintiff other tasks in clock assembly. On 21 July 1998, plaintiff returned to Dr. Brenner and reported some improvement in her hand. Plaintiff was allowed to increase her activities but ordered not to return to dialing. On 24 September 1998, plaintiff returned to Dr. Brenner with further problems in both hands. Plaintiff's left wrist was injected, and nerve conduction studies showed plaintiff had bilateral carpal tunnel syndrome.

Dr. Brenner performed surgery on plaintiff's right carpal tunnel on 26 October 1998 and on plaintiff's left carpal tunnel on 30 November 1998. Dr. Brenner released plaintiff to light-duty work on 21 December 1998 and advised that plaintiff could return to full duty on an "as-tolerated" basis. Employer provided light-duty work to plaintiff for some time, but returned her to the dialing position. On 13 April 1999, plaintiff returned to Dr. Brenner because her hands were swelling and hurting while dialing. Dr. Brenner advised plaintiff to avoid dialing permanently.

Plaintiff returned to her original position as a UPC labeler. Plaintiff was required to place a sticker on one out of four boxes, for a total of 1,000 boxes a day. Plaintiff failed to label the boxes as required. Plaintiff was reprimanded and did not explain why she missed the boxes. Plaintiff testified that she experienced some difficulty with her hands while performing the labeling job.

On 5 May 1999, plaintiff was terminated from her job with defendant-employer. Employer admitted liability for benefits for plaintiff's carpal tunnel syndrome and paid compensation to plaintiff for temporary total disability while plaintiff was out of work for the surgery and the plaintiff's medical bills. Employer has not paid plaintiff further sums since her termination.

The Commission found that plaintiff's termination was a direct result of poor job performance and that she constructively refused suitable employment offered by her employer after the surgery. The Commission found the labeling job to be suitable for plaintiff. Plaintiff presented no evidence of disability as a result of her injury.

## McRAE v. TOASTMASTER, INC.

[158 N.C. App. 70 (2003)]

The Commission found that plaintiff was not entitled to disability benefits after termination of her employment. Plaintiff had an average weekly wage of $250.00, according to the Form 21. This wage yielded plaintiff a compensation rate of $166.67 per week for 16 weeks based upon an impairment rating of 4% to each hand. Employer was to provide all medical compensation arising from the injury as well as plaintiff's attorney fees and costs. Commissioner Thomas Bolch dissented from the award of the Commission because he found as fact that plaintiff's inability to perform the labeling job was caused by her occupational disease of carpal tunnel syndrome. Plaintiff appeals.

### II. Issues

The issues are (1) whether the Commission erred in relying upon *Seagraves v. Austin Co. of Greensboro*, 123 N.C. App. 228, 472 S.E.2d 397 (1996) in holding that plaintiff "was terminated for misconduct and she thereby constructively refused suitable employment" and (2) whether the Commission erred in determining plaintiff's weekly wage and compensation rate.

### III. Standard of Review

"[A]ppellate courts reviewing Commission decisions are limited to reviewing whether any competent evidence supports the Commission's findings of fact and whether the findings of fact support the Commission's conclusions of law." *Deese v. Champion Int'l Corp.*, 352 N.C. 109, 116, 530 S.E.2d 549, 553 (2000). Conclusions of law are reviewed *de novo*. *Grantham v. R.G. Barry Corp.*, 127 N.C. App. 529, 534, 491 S.E.2d 678, 681 (1997), *disc. review denied*, 347 N.C. 671, 500 S.E.2d 86 (1998).

### IV. *Seagraves v. Austin Co. of Greensboro*

[1] Plaintiff contends that the Commission erred in applying *Seagraves* to the facts at bar. The Commission found as fact that the UPC labeler position was a suitable job for the plaintiff. The Commission based this finding upon evidence that plaintiff had performed that job satisfactorily prior to working as a dialer and that plaintiff did not seek mental or physical help in undertaking this job after the surgery. Competent evidence supports the Commission's finding that the labeler position was suitable.

The Commission further found that plaintiff was capable of labeling and that plaintiff's failure to perform the labeler position constituted a failure to accept a suitable position offered by the employer.

The Commission concluded under the law of *Seagraves* that plaintiff's misconduct in failing to perform the task was a constructive refusal of employment.

Competent evidence in the record supports the Commission's finding that plaintiff was capable to perform as a labeler. The issue becomes whether plaintiff's poor performance is misconduct under *Seagraves*.

To determine whether an employee's misconduct amounts to a constructive refusal to perform work, justifying termination under N.C.G.S. § 97-32, this Court in *Seagraves* stated

> the employer must first show that the employee was terminated for misconduct or fault, unrelated to the compensable injury, for which a nondisabled employee would ordinarily have been terminated. If the employer makes such a showing, the employee's misconduct will be deemed to constitute a constructive refusal to perform the work provided and consequent forfeiture of benefits for lost earnings, unless the employee is then able to show that his or her inability to find or hold other employment of any kind, or other employment at a wage comparable to that earned prior to the injury, is due to the work-related disability.

*Seagraves*, 123 N.C. App. at 234, 472 S.E.2d at 401.

The employee in *Seagraves* briefly exposed her buttocks to other female workers and was terminated for gross misconduct while working. *Id.* at 229, 472 S.E.2d at 398. Plaintiff, at bar, failed to perform her duties as required. She was terminated for what she failed to do rather than for an affirmative act. Although the dissenting opinion characterizes plaintiff's failure to perform her job as negligent behavior, competent evidence in the record supports a finding of misconduct under *Seagraves*.

Employer provided competent evidence to show that plaintiff's failure to perform the labeling task was not related to her prior compensable injury. A worker's failure to perform required tasks for employer results in reprimands and eventually termination. There is no indication that employer treated plaintiff's misconduct differently than that of other employees in deciding to terminate her employment. The burden shifted to the plaintiff to show that "her inability to find or hold other employment of any kind, or other employment at a wage comparable to that earned prior to the injury, is due to the work-related disability." *Id.* at 234, 472 S.E.2d at 401.

McRAE v. TOASTMASTER, INC.

[158 N.C. App. 70 (2003)]

The Commission found as fact that plaintiff failed to present any evidence of disability as a result of her injury and that all presumption of disability ended when plaintiff returned to employment. We affirm the Commission's conclusion that plaintiff constructively refused suitable employment.

## V. Average Weekly Wage

[2] Employer contends that the Commission erred in finding plaintiff's average weekly wage to be $250.00 as listed on the Form 21. Employer argues that this finding is not supported by any competent evidence in the record because all competent evidence in the record is contrary. Employer submitted time charts and wage records that plaintiff's average weekly wage was $213.45 to yield a compensation rate of $142.30. Although this evidence could form the basis for a Form 22 filing, one was not submitted.

These documents do not render incompetent the Form 21 filed with the Commission which listed the average weekly wage at $250.00. "[T]he findings of fact of the Industrial Commission are conclusive on appeal when supported by competent evidence, even though there be evidence that would support findings to the contrary." *Deese*, 352 N.C. at 115, 530 S.E.2d at 552-53. Employer's assignment of error is overruled.

Affirmed.

Judge STEELMAN concurs.

Judge WYNN dissents.

WYNN, Judge dissenting.

Under *Seagraves v. Austin Co.*, 123 N.C. App. 228, 472 S.E.2d 397 (1996), this Court created a justifiable legal fiction that permits an employer to terminate an employee (who suffers from a compensable workers compensation injury) for intentional or gross misconduct. In this case, the majority seeks to expand the holding of *Seagraves* to allow the termination of injured employees for acts of negligence rather than intentional or gross misconduct. Because I believe such an extension fails to comport with the liberal construction accorded our Workers' Compensation Act, I dissent.

The plaintiff in this matter, Ms. Alberta McRae, functions at a fourth-grade level with an IQ of 59. Toastmasters employed her

in 1996 to place labels on clocks on a conveyer belt. According to the full Commission, this task required Ms. McRae "to pull [approximately 1000]. . . labels off a roll [a day] and place them onto boxes."

Six months thereafter, Toastmaster reassigned Ms. McRae to the clock dial and face assembly line. According to the full Commission, this task required Ms. McRae to "insert[] the movement into the back of the clock, to turn[] the clock over and then put[] the hour and minute hands on the front of the clock. The production rate was one hundred and twenty-five clocks per hour." After engaging in this task without incident for over a year, Ms. McRae complained of bilateral numbness. Ultimately, Dr. Mark E. Brenner performed a carpel tunnel release on her left and right upper extremities. Dr. Brenner ordered Toastmaster to *permanently* avoid assigning Ms. McRae to the clock dialing and face assembly line. Despite this express order, Toastmaster returned Ms. McRae to the clock dialing and face assembly position. As a direct result, Ms. McRae continued to suffer and complain of numbness and pain in her upper extremities.

Thereafter, Toastmaster reassigned Ms. McRae to her previous position as an assembly line labeler and undertook for the first time, the action of "writing-up" Ms. McRae each time she failed to affix a label to a clock. After four such "write-ups," Toastmaster terminated her employment. Three weeks after her termination, Toastmaster received a belated letter from Dr. Brenner in which he advised Toastmaster to avoid assigning Ms. McRae to tasks involving "repetitious pushing, pulling, gripping, pinching, and fingering." As noted by the full Commission, the labeling job required Ms. McRae to repetitiously pull labels off the roll. Despite this description, and Dr. Brenner's instructions, the full Commission concluded, and today the majority affirms, that Ms. McRae "was terminated for misconduct and she thereby constructively refused suitable employment." In so holding and affirming, the full Commission and the majority rely on a misapprehension of the equitable legal fiction this Court created in *Seagraves*.

In *Seagraves*, this Court addressed the question of whether an employee's termination for misconduct—exposing her "buttocks to two female co-employees"—constituted a constructive refusal to accept suitable employment a voluntary forfeiture of her workers' compensation benefits for her compensable occupational disease pursuant to N.C. Gen. Stat. § 97-32 (2002). In *Seagraves*, we recognized that the issue was one of first impression in North Carolina.

**McRAE v. TOASTMASTER, INC.**

[158 N.C. App. 70 (2003)]

Accordingly, this Court thoughtfully analyzed the divergent views of other jurisdictions, and the liberal construction accorded to North Carolina's Workers' Compensation Act, before adopting a general rule that where an injured employee is allegedly terminated for misconduct,

> the test is whether the employee's loss of . . . wages is attributable to the wrongful act resulting in loss of employment, in which case benefits will be barred, or whether such loss . . . in earning capacity is due to the employee's work-related disability, in which case the employee will be entitled to benefits for such disability. . . . The application of this rule will, we believe, best achieve fairness to all parties by assuring that an injured employee is awarded benefits for wage loss which is clearly attributable to his or her job-related disability, *while protecting employers from liability to employees who engage in intentional, unacceptable conduct* while employed in rehabilitative or light duty settings.

*Seagraves*, 123 N.C. App. at 233-34, 472 S.E.2d at 401. The *Seagraves* misconduct test was devised to protect employers, and the workers' compensation system, from employees who are terminated for intentional or unacceptable conduct while occupying a rehabilitative position. Under *Seagraves*, the employer is no longer responsible for the employee's diminution in wages, because the diminution was proximately caused by misconduct rather than an occupational injury or disease.

Since our decision in *Seagraves*, we have applied the misconduct test on three occasions. In *Williams v. Pee Dee Elec. Mbrshp. Corp.*, 130 N.C. App. 298, 502 S.E.2d 645 (1998), an employee, who suffered from a compensable injury, was terminated two days after his criminal conviction for indecent exposure. Although we remanded the case for further findings of fact, we clarified our holding in *Seagraves* by noting that:

> First, there is no requirement that the employee's misconduct occur during working hours or at the workplace. Second, there is no requirement that the misconduct constitute a crime. The misconduct need only be such that a non-disabled employee would ordinarily have been discharged for it. Third, a finding that the employee was discharged for misconduct "pursuant to company policy" is not sufficient to support a conclusion that the employee has constructively refused employment. The Commission must specifically find that the employee was discharged for miscon-

duct for which a non-disabled employee would ordinarily have been terminated.

*Williams*, 130 N.C. App. at 302, 502 S.E.2d at 648.

Next, in *Flores v. Stacy Penny Masonry Co.*, 134 N.C. App. 452, 518 S.E.2d 200 (1999), an employee had missed a substantial number of work days because of an occupational disease. In one instance, however, the employee requested a day off for personal matters. The employer refused the employee's request and terminated the employee on the basis of misconduct for failing to attend work. Because the employer "admitted that he would not have fired an employee for taking a day off to tend to personal matters, if that employee's attendance was satisfactory," the full Commission concluded that plaintiff's "employment was terminated as a direct result of time missed from work over a period of several months due to his continuing disability caused by his compensable injury, and not for *misconduct* or other just cause." *Flores*, 134 N.C. App. at 458, 518 S.E.2d at 205. On appeal, we found no error in this finding.

Finally, in *Frazier v. McDonald's*, 149 N.C. App. 745, 562 S.E.2d 295 (2002), we addressed whether the full Commission erred in finding that an injured employee was not terminated for misconduct where the employee was allegedly terminated because her register drawer was short by $44.83. In finding no error, we noted that it was the common practice for McDonald's to suspend employees for a week without pay when their cash registers are short. Accordingly, we held that "competent evidence in the record [] support[ed] the Commission's finding and conclusion that [McDonald's] failed to show that plaintiff's termination was for misconduct or fault . . . 'for which a non-disabled employee would ordinarily have been terminated.' " *Frazier*, 149 N.C. App. at 751, 562 S.E.2d at 299.

Thus, our case law interpreting and applying the *Seagraves* misconduct test reveals that this Court has only applied that test in instances where an injured employee has engaged in intentional or gross misconduct. Under *Seagraves* this Court created a justifiable legal fiction: An injured employee who is terminated for misconduct is considered to have constructively refused suitable employment and is barred from receiving workers' compensation benefits. However, the *Seagraves* Court went to great lengths to develop a misconduct test that "comports with the underlying purpose of North Carolina's Workers' Compensation Act to provide compensation to workers whose earning capacity is diminished or destroyed by injury

arising from their employment . . . and the liberal construction which has long been accorded its provisions." *Seagraves*, 123 N.C. App. at 233, 472 S.E.2d at 401 (citations omitted). In today's decision the majority expands the *Seagraves* misconduct test to include instances where an employee is terminated for negligence rather than intentional or gross misconduct. Where *Seagraves* protected employers and the workers' compensation system from the willful or gross misconduct of employees, the rule articulated by the majority allows employers to terminate injured employees for acts of "mere negligence" in order to avoid their responsibilities under the Workers Compensation Act.[1]

In the case *sub judice*, the record shows no evidence that Ms. McRae engaged in willful or gross misconduct. In my view, the evidence is susceptible to only two interpretations: (1) pain in her upper extremities, as documented by her treating physician, prevented Ms. McRae from performing a task she previously performed without incident, or (2) Ms. McRae negligently failed to place the labels on the clock. In either case, it is error to apply the legal fiction of *Seagraves* to the facts of this case, and to deprive Ms. McRae of her right to benefits under North Carolina's Workers' Compensation Act. I dissent.

_____

1. A *per curiam* affirmance of today's decision by our Supreme Court would elevate the majority opinion to a Supreme Court opinion. In that light, *Seagraves* would be expanded to include acts of mere negligence. I believe an expansion of the legal fiction of *Seagraves* to include acts of mere negligence would be in contravention of our Workers' Compensation Act.